**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EDWIN P. HARRISON,
<u>Plaintiff-Appellant,</u>

and

UNITED STATES OF AMERICA,
<u>Party in Interest,</u>

No. 98-1037

v.

WESTINGHOUSE SAVANNAH RIVER
COMPANY,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Charles E. Simons Jr., Senior District Judge.
(Ca-94-2332-1-6)

Argued: October 28, 1998

Decided: May 17, 1999

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
BLAKE, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded for proceedings con-
sistent with this disposition by published opinion. Judge Murnaghan
wrote the opinion, in which Judge Williams and Judge Blake joined.

_____

**COUNSEL**

**ARGUED:** Richard E. Miley, North Augusta, South Carolina, for
Appellant. Lawrence Graeme Bell, III, CROWELL & MORING,

L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Christopher M. Farris, CROWELL & MORING, L.L.P., Washington, D.C., for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Relator Harrison ("Harrison" or "Appellant") brought a claim under the False Claims Act, 31 U.S.C.A. §§ 3729-3733 (West Supp. 1998), against Westinghouse Savannah River Corp. ("WSRC") alleging that WSRC made false and fraudulent statements to the government in connection with claims for payment to a subcontractor hired by WSRC for a Department of Energy ("DOE") contract. Harrison alleged, inter alia, that WSRC misrepresented the cost and duration of the proposed subcontract in order to get DOE approval for the subcontract, and that WSRC falsely certified that there was no conflict of interest with the subcontractor. The district court granted WSRC's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), finding that no false claim had been made, either because Harrison's complaint amounted only to allegations of inefficiency, or because the allegedly false statements were not made in connection with a "claim" under the False Claims Act. We affirm in part and reverse in part.

I.

A.

Since 1989, WSRC has been the management and operations contractor for the United States Department of Energy at the Savannah River Site ("SRS"), a nuclear facility near Aiken, South Carolina. WSRC's contract with the government provides that WSRC is entitled to receive the allowable costs it incurs on the project in addition to an award fee.

As a part of its contractual responsibilities, and pursuant to policy and regulations, when WSRC decides to subcontract certain tasks necessary for the operation and management of the SRS, WSRC pro-

2

vides the technical requirements to the DOE for review before releasing a solicitation or request for proposals ("RFP") for that subcontracting action. See Department of Energy Acquisition Regulation ("DEAR") § 970.7108, 48 C.F.R.§ 970.7108 (1988).**1** Once the technical review is complete, WSRC releases an RFP for the work and selects the subcontractor in a manner consistent with the provisions of the RFP. WSRC then sends a "Procurement Under Review" or "PUR" package to the DOE, which includes a copy of the technical requirements, the solicitation, the Justification for Award, the subcontractor-awardee's proposal, and the proposed subcontract. The DOE reviews the information in the package and decides whether it will approve the request to subcontract the work out. If the DOE approves, WSRC enters into a subcontract with the selected subcontractor.

Count 1:**2** False-Statements About Need for Subcontractor and Price of Subcontract

In July 1992, WSRC identified a need for training related to in-tank precipitation process operations, known as "ITP Training" (hereinafter "ITP Training Project"). As part of its standard practice, WSRC included in the technical package that was sent to the DOE for review a "Make or Buy Analysis" ("MBA"), which analyzed the cost-effectiveness of buying the ITP Training services as opposed to providing those services in-house. (Amended Complaint at ¶ 24.) The MBA stated that while WSRC had the capacity to provide the service, WSRC did not have personnel available. The MBA stated further that since the service was of a one-time variety and of a short-term nature (1.5 years), it was not practical for WSRC to hire full-time staff to meet the need.

_____

**1** All references to the applicable procurement regulations are to those that were in effect at the time that the WSRC-DOE contract became effective.

**2** The "Counts" detailed herein do not correspond exactly to the counts as enumerated in Harrison's amended complaint; they are distilled. For the district court's convenience reference is made to the corresponding paragraphs in Harrison's First Amended Complaint.

3

WSRC's MBA also represented to the government that in the aggregate, WSRC estimated that the cost for WSRC to provide the ITP Training would be $1,579,500, while the cost for a subcontractor to perform the work would be substantially more-- $2,750,000. The DOE reviewed and signed off on the technical package, including the MBA. After receiving the DOE's approval, WSRC released a request for proposals for the ITP Training Project and ultimately subcontracted the project to General Physics Corporation (hereinafter "GPC subcontract").

Harrison alleges that WSRC made the following misrepresentations to the government as part of its "plan and scheme" to obtain DOE approval for WSRC's use of a subcontractor rather than use of WSRC's own personnel to develop and implement the ITP Training Project:

> a. That the project was "short term" such that subcontract personnel would be needed for no more than 1.5 years; WSRC knew that developing and implementing the ITP Training Project would take at least several years, (Amended Complaint ¶ 24(a));
>
> b. That providing the ITP Training was not "a continuing need" but rather was a "one time variety" project; WSRC knew that the ITP Training Project would be a continuous on-going need for many years, (Amended Complaint ¶ 24(b));
>
> c. That there was no need to hire permanent staff to fulfill the ITP Training requirement; WSRC knew that the ITP Training Project would require qualified trainers for a decade or more, (Amended Complaint ¶ 24(c);
>
> d. That "Other Costs" for such things as computers, etc., would be zero; WSRC knew that the subcontractor would need to purchase computers to perform the subcontract work, (Amended Complaint ¶ 24(e)); (See also Amended Complaint ¶ 33); and

4

e. That the ITP Training services could be obtained on a firm-fixed price basis at a "total cost" of $2,750,000; WSRC intended to subcontract the ITP Training Project on a cost-plus-fixed-fee basis and knew that the training would cost substantially more than $2,750,000, (Amended Complaint ¶¶ 24(d), 22(a)).

Count 2: False Certification of No Conflict of Interest

General Physics Corporation ("GPC"), a subcontractor company doing business with WSRC at SRS, employed Relator Harrison as one of its vice-presidents. He worked for GPC in Aiken, directing some of GPC's subcontract work with WSRC at SRS. On August 12, 1992, GPC received from WSRC a RFP for the ITP Training Project.

During the next several weeks, Harrison alleges that he became aware that GPC personnel developing GPC's proposal were requesting and improperly receiving insider information from WSRC's Subcontract Technical Representative ("STR"). Harrison allegedly found that WSRC's STR, who would later participate in the technical evaluation of the bids on the ITP Training Project, was supplying insider information not available to other bidders. He also alleges that he learned that WSRC's STR had permitted GPC employees to participate in preparation of portions of the RFP.[3] (Amended Complaint ¶ 28.) WSRC awarded the ITP Training subcontract to GPC.

(a) In its proposal, GPC represented that it had no conflicts of interest related to the ITP Training subcontract. This certification was submitted to the DOE by WSRC as part of the "Justification for Award" in the PUR package. Harrison alleges that (1) the contacts between WSRC and GPC violated DEAR conflict of interest regulations, (2) WSRC was obliged to comply with these regulations and to certify

_____

[3] Harrison alleges that he confronted GPC's President and Chief Executive Officer and its Senior Vice President in September, 1992 concerning these allegedly illegal activities. As a result, Harrison alleges that GPC removed Harrison as an officer, banned him from GPC's offices, and terminated his employment contract. Harrison asserts that he prevailed in a civil action against GPC and several of its officers arising from this discharge.

5

such compliance, and (3) WSRC falsely certified to the DOE that it had complied with these regulations. Harrison asserts that this false certification caused all claims for DOE reimbursement on the GPC subcontract to be "false claims."[4]

(b) Harrison also alleges that WSRC had an affirmative obligation to report undisclosed conflicts of interest with its subcontractors when a subcontract was significantly increased. WSRC's failure to alert the DOE to these conflicts, even after Harrison had given notice to WSRC about the conflicts, allegedly makes all claims submitted under several expansions of the GPC subcontract fraudulent. (Amended Complaint ¶¶ 27 (first sentence), 36.)

Count 3: Misrepresentation of Subcontract Terms

(a) Harrison alleges that after the GPC subcontract was approved, WSRC misrepresented the scope of work for the ITP Training Project. According to Harrison, the subcontract did not set forth any requirement for subcontractor personnel to perform procedure development. Less than three months into the ITP Training subcontract, however, WSRC knowingly misrepresented to the DOE that the existing ITP Training subcontract in fact provided for procedure revision and upgrade not to exceed 5% of the total scope of work. Based upon WSRC's misrepresentation, the DOE approved WSRC's request for adding work to the subcontract on a "sole-source" basis at a cost of $880,000. (Exhibit C to Amended Complaint; Amended Complaint ¶ 22(b) and (c).)

(b) Separately, Harrison alleges that before this $880,000 procedure development cost was approved, WSRC had directed GPC to perform procedure development activities. Since at that time, these activities were allegedly not approved costs under the contract, Harrison alleges that WSRC's payment requests incorporating these activities were fraudulent. (Amended Complaint ¶ 34.)

_____

[4] Although Harrison asserts five separate variations on this theme, (see Amended Complaint ¶¶ 25(g), 26, 28, 29, 30), these paragraphs of the complaint essentially boil down to one claim dealing with the initial conflict of interest certification, and will be treated as such in this opinion.

6

Count 4: False Signature

Harrison alleges that a purchase requisition form submitted to the DOE contained "fraudulent and/or unauthorized signatures" and WSRC knew that at least one of these was fraudulent. (Amended Complaint ¶ 23.)

Count 5: Breach of Fiduciary Duty

Harrison alleges that WSRC held itself out as being experienced and qualified to maintain a nuclear facility and had contractual and fiduciary duties to act in the DOE's best interest. WSRC supposedly violated these duties by engaging "in a scheme and plan to increase the cost of performance and its fees under its contract, acting with actual knowledge or with reckless disregard for the truth or with deliberate ignorance." (Amended Complaint ¶ 25(a)-(g).)

Count 6: Knowing Misrepresentation of Costs of Subcontract

In addition to the allegations under Count 1, Harrison asserts that WSRC knowingly under-estimated the cost of the GPC subcontract by allowing GPC to understate its overhead costs for GPC's ITP Training Project bid. The under-estimated costs were submitted to the DOE as part of the PUR package. This was done in an effort to get the DOE to approve subcontracting. (Amended Complaint ¶ 31.)

Count 7: Increased Labor Costs

Harrison alleges that GPC changed the personnel on the GPC sub-contract bid in order to raise the labor costs in that bid. GPC then assigned personnel with lower salaries than those on the bid to perform under the GPC subcontract. (Amended Complaint¶ 32.)

Count 8: Over-Charging Via "Other Direct Costs" Account

Harrison alleges that WSRC directed GPC and other subcontractors to purchase supplies and charge them to "Other Direct Costs," when WSRC "had a duty to acquire them through its own procurement system at lower costs." (Amended Complaint ¶ 33.) By this practice

7

WSRC was allegedly able to circumvent DOE approval for purchasing certain items and to inflate its operating costs base to the DOE.

Count 9: Lack of Management Controls

Harrison alleges that WSRC by contract and regulation was required to maintain effective systems of management to safeguard against theft, fraud, and waste and did not do so. (Amended Complaint ¶ 38.)

Count 10: Conspiracy

Though not clearly pled in his Amended Complaint, Harrison asserts in his brief that once the ITP Training subcontract was awarded, WSRC and GPC then engaged in a conspiracy to routinely "sole source" modifications of the ITP Training Project, increasing the subcontract cost from $2,461,161 to more than $9.3 million without allowing any competition for the provision of the services represented by the additional $6.9 million. (Appellant's Br. at 10.) (Cf. also Amended Complaint ¶¶ 27, 37.)

B.

The district court granted WSRC's motion to dismiss under Rule 12(b)(6). The district court had two bases for its order. First, the district court found that at best Harrison's complaints amounted to allegations that WSRC handled the DOE contract with waste and inefficiency and the FCA does not reach such claims. The district court also found that, even if Harrison had proved false statements and fraud, as a matter of law there was no false claim under the False Claims Act because the false statements and fraud "were not made in connection with the presentation of a claim." (J.A. at 56.) The district court reasoned that the False Claims Act does not reach false statements in submissions to the Government to gain approval for subcontracting decisions. In the district court's view, the False Claims Act reaches only situations in which a "claim [i.e., the demand for payment from the government] . . . is itself false or fraudulent." (J.A. at 57.)

8

II.

This Court reviews de novo a district court's dismissal for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). Cavallo v. Star Enterprise, 100 F.3d 1150, 1153 (4th Cir. 1996). In its review of Rule 12(b)(6) dismissals, this Court must accept as true all of the Appellant's allegations and must construe factual allegations in the light most favorable to the plaintiff. Mylan Laboratories, Inc. v. Matkari , 7 F.3d 1130, 1134 (4th Cir. 1993).

A. Pleading Fraud with Particularity[5]

Since Appellant in this case alleges fraud, his claim is subject to Federal Rule of Civil Procedure 9(b), which requires that claimants plead fraud with particularity.[6] According to two noted scholars, the "circumstances" required to be pled with particularity under Rule 9(b) are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990). See also Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 980 (4th Cir. 1990); In re Cryomedical Sciences, Inc. Securities Litigation, 884 F. Supp. 1001, 1012-13 (D. Md. 1995); In re Medimmune, Inc. Securities Litigation, 873 F. Supp. 953, 964-69 (D. Md. 1995). Mere allegations of "fraud by hindsight" will not satisfy the requirements of Rule 9(b). Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994). The second sentence

_____

[5] Although the district court did not dismiss Harrison's complaint under Rule 9(b), lack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6). See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp. , 125 F.3d 899, 901 (5th Cir. 1997). Also, both parties presented arguments under Rule 9(b) to the court below, and in their briefs here. So it is appropriate for us to address the validity of Harrison's pleadings under Rule 9(b).
[6] Fed. R. Civ. P. 9(b) states:"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

9

of Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive. See 5 Wright and Miller § 1297, at 612.

Rule 9(b) has four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. ... Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc., 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990). A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial pre-discovery evidence of those facts.

B. The False Claims Act

Originally passed during the Civil War in response to overcharges and other abuses by defense contractors, Congress intended that the False Claims Act, 31 U.S.C.A. §§ 3729-3733 (West Supp. 1998), and its qui tam action would help the government uncover fraud and abuse by unleashing a "posse of ad hoc deputies to uncover and prosecute frauds against the government." United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992). The first substantial amendments to the False Claims Act came in 1986. See S. Rep. No. 99-345, at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266. In the 1986 amendments, Congress sought to broaden the availability of the False Claims Act to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." Id. Congress was acting, in part, in response to judicial decisions taking a restrictive approach to the False Claims Act. See id. at 4, reprinted in 1986 U.S.C.C.A.N. at 5269.

10

The False Claims Act allows private litigants to bring actions on behalf of the government against anyone who, <u>inter alia</u>:

> (1) knowingly presents, or causes to be presented, [to the government] a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C.A. § 3729(a); 31 U.S.C.A. § 3730(b).

The term "knowingly" has a special meaning within the context of the False Claims Act:

> "knowing" and "knowingly" mean that a person, with respect to information--
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information,
>
> and no proof of specific intent to defraud is required.

31 U.S.C.A. § 3729(b).

Liability under each of the provisions of the False Claims Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material.[7] Materiality depends on "whether the

_____

[7] Some courts have asserted that there is an additional element that the United States must have suffered some damages as a result of the false

11

false statement has a natural tendency to influence agency action or is capable of influencing agency action." United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala., 104 F.3d 1453, 1459 (4th Cir.), cert. denied, ___ U.S. ___, 118 S. Ct. 301 (1997) (quoting United States v. Norris, 749 F.2d 1116, 1122 (4th Cir. 1984)). Materiality is a mixed question of law and fact. See id. at 1460.

The Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government. See United States v. McNinch, 356 U.S. 595, 599 (1958). In order for a false statement to be actionable under the False Claims Act it must constitute a "false or fraudulent claim." "[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the `claim for payment.'" United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995). Therefore, a central question in False Claims Act cases is whether the defendant ever presented a "false or fraudulent claim" to the government.

Interpreting the last word of the phrase is fairly easy. The False Claims Act states that a claim "includes any request or demand ... for money or property" where the government provides any portion of the money or property requested. 31 U.S.C.A. § 3729(c). In other words, the False Claims Act at least requires the presence of a claim -- a call upon the government fisc -- for liability to attach.

Taking the phrase "false or fraudulent claim" in its entirety, though, is more complicated, because the phrase has become a term of art.

_____

or fraudulent claim. See, e.g., Blusal Meats, Inc. v. United States, 638 F. Supp. 824, 827 (S.D.N.Y. 1986), aff'd, 817 F.2d 1007 (2nd Cir. 1987). In fact, there is no requirement that the government have suffered damages as a result of the fraud. See United States ex rel. Joslin v. Community Home Health of Maryland, Inc., 984 F. Supp. 374, 383 (D. Md. 1997) (citing United States ex rel. Pogue v. American Healthcorp., Inc., 914 F. Supp. 1507, 1508-09 (M.D. Tenn. 1996)); S. Rep. No. 345, 99th Cong., 2d Sess. 8, reprinted in 1986 U.S.C.C.A.N. at 5273. Cf. United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943) (affirming, without addressing, district court's determination that no damages need be incurred). But cf. United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala., 104 F.3d 1453, 1458 (4th Cir.), cert. denied, ___ U.S. ___, 118 S. Ct. 301 (1997) (government must suffer an injury in fact for there to be standing).

12

The district court would only find a false claim where a demand for payment is itself false or fraudulent (presumably for services not performed or for an incorrect amount). The district court flatly rejected the possibility that False Claims Act liability could rest on false statements submitted to the government to gain approval for a subcontract. The district court relied on two cases for this approach, United States v. McNinch, 356 U.S. 595 (1958), and United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 938 F. Supp. 399 (S.D. Tex. 1996) (additional history below).

The district court's narrow interpretation of the phrase "false or fraudulent claim" is incorrect. First, there are problems with the cases relied upon by the district court. McNinch was decided under a criminal version of the False Claims Act and the Court explicitly relied on a rule of lenity-type analysis in reaching its interpretation of the statute. McNinch, 356 U.S. at 598. The current statute is not criminal, and so a rule of lenity approach is no longer appropriate. Also, McNinch was a very narrow holding reflecting the facts of that case. No request for payment from the government had yet been made when McNinch was decided, and the Court left open the question whether the False Claims Act would apply if and when a claim on the government fisc was made. Id. at 599 n.6. Subsequent cases confirm that the act which did not violate the False Claims Act in the factual context of McNinch does lead to False Claims Act liability when the government fisc is finally called upon. See United States v. Rivera , 55 F.3d at 707, and cases cited therein. The second case relied upon by the district court, Thompson, had already been vacated when the district court relied upon it. See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899 (5th Cir. 1997), aff'g in part and vacating in part 938 F. Supp. 399 (S.D. Tex. 1996).

Second, and more importantly, the district court's approach is in contradiction to the legislative history of the statute and to many courts, including the Supreme Court, that have addressed the issue.

According to Congress, after the 1986 amendments the False Claims Act should be broadly construed:

> each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by

13

> means of false statements or other corrupt or fraudulent con-
> duct, <u>or in violation of any statute or applicable regulation</u>,
> constitutes a false claim.

S. Rep. No. 99-345, at 9, <u>reprinted in</u> 1986 U.S.C.C.A.N. at 5274
(emphases added). The courts have implemented the principles
embodied in the above-quoted passage in a variety of ways.

1. <u>False Certification Cases</u>

A number of courts in a variety of contexts have found violations
of the False Claims Act when a government contract or program
required compliance with certain conditions as a prerequisite to a gov-
ernment benefit, payment, or program; the defendant failed to comply
with those conditions; and the defendant falsely certified that it had
complied with the conditions in order to induce the government bene-
fit. Courts have allowed False Claims Act claims to go forward based
on false certifications with respect to compliance with environmental
standards, <u>see United States ex rel. Fallon v. Accudyne Corp.</u>, 880
F. Supp. 636, 638 (W.D. Wis. 1995); false certifications of compli-
ance with the non-discrimination requirements of the Fair Housing
Act and with an affirmative action plan, <u>see United States v. Incorpo-
rated Village of Island Park</u>, 888 F. Supp. 419, 434-36, 440-41
(E.D.N.Y. 1995); false certifications of compliance with the Medicare
anti-kickback and anti-self-referral statutes, <u>see United States ex rel.
Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899, 902;
<u>United States ex rel. Pogue v. American Healthcorp., Inc.</u>, 914
F. Supp. 1507, 1509 & 1513 (M.D. Tenn. 1996); and false certifica-
tions of compliance with rules for continuing adherence to the
requirements of a Small Business Administration minority contracting
program, <u>see Ab-Tech Construction, Inc. v. United States</u>, 31 Fed. Cl.
429 (1994), <u>aff'd</u>, 57 F.3d 1084 (Fed. Cir. 1995).[8] The courts in these

---

[8] These last two cases involved implied certifications rather than actual
certifications made by the defendants. That is, plaintiffs contended that
the submission of invoices and reimbursement forms constituted implied
certifications of compliance with the terms of the particular government
program. <u>Ab-Tech</u>, 31 Fed. Cl. at 433-434; <u>Pogue</u>, 914 F. Supp. at 1509.
At least one district court in this Circuit has expressed some reservations
about the concept of an implied certification. <u>See United States ex rel.</u>

14

cases will not find liability merely for non-compliance with a statute or regulation. See, e.g., Thompson, 125 F.3d at 902. The Fifth Circuit has emphasized that liability for a false certification will lie only if compliance with the statutes or regulations was a prerequisite to gaining a benefit, and the defendant affirmatively certified such compliance: "where the government has conditioned payment of a claim upon a claimant's certification of compliance with ... a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." Thompson, 125 F.3d at 902. Accord United States ex rel. Joslin v. Community Home Health of Md., Inc., 984 F. Supp. 374, 383-84 (D. Md. 1997).**9**

2. Fraud-in-the-Inducement Cases

Another set of cases involves False Claims Act liability for claims that would not be false under the district court's interpretation of the statute -- the fraud-in-the-inducement**10** cases. In these cases, courts,

_____

Joslin v. Community Home Health of Maryland, Inc. , 984 F. Supp. 374, 384-385 (D. Md. 1997). Our decision in Berge, 104 F.3d at 1461, holding, in part, that there can be no False Claims Act liability for an omission without an obligation to disclose, also makes questionable an implied certification claim in the Fourth Circuit. We need not address the validity and problems of an implied certification theory of liability here.

**9** Several cases, although not rejecting the fraudulent certification theory, involve facts under which such a theory was not successful. See United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266-67 (9th Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 958 (1997) (specifically accepting fraudulent certification theory, but finding that certification was not prerequisite to funding, and was not false, in any event; involved federal special education funding); Joslin, 984 F. Supp. at 383-384 (accepting fraudulent certification theory, but finding no falsity; involved Medicare reimbursement); United States v. Shaw , 725 F. Supp. 896, 900 (S.D. Miss. 1989) (rejecting implied certification theory, finding that no certification was made; involved bribes to get loans); United States ex rel. Weinberger v. Equifax, 557 F.2d 456, 461 (5th Cir. 1977) (finding no certification was made and none was required; involved alleged violation of Anti-Pinkerton Act).

**10** The phrase "fraud-in-the-inducement" in the False Claims Act context was coined by the court in United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 199 (D.C. Cir. 1995).

15

including the Supreme Court, found False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct. The most prominent of these cases is United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943). In that case, the Supreme Court found contractors liable under the False Claims Act for claims submitted under government contracts which the defendants obtained via collusive bidding. Id. at 542.**11** The Court found that each claim submitted under the contracts constituted a false or fraudulent claim:

> This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government] . . . . The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal-- payment of government money to persons who had caused it to be defrauded.

Id. at 543-44. Based on this language, courts have found False Claims Act violations in other bid-rigging situations, see, e.g., United States v. CFW Construction Co., Inc., 649 F. Supp. 616, 618 (D.S.C. 1986), dismissed on other grounds, 819 F.2d 1139 (4th Cir. 1987); when a contract was originally obtained based on false information or fraudulent pricing, see United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir. 1991); United States ex rel. Windsor v. Dyncorp, Inc., 895 F. Supp. 844, 850-51 (E.D. Va. 1995); United States v. General Dynamics Corp. , 19 F.3d 770, 772 & 775 (2d Cir. 1994) (defendant liable for submitting inflated cost estimates in subcontract submitted for approval to government); or when a contract was obtained by a false representation about the ability to perform the contract, cf. United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 199 (D.C. Cir. 1995) (court did not reach the question, but suggested it would have upheld such a theory had it been properly presented). But see United States v. Shaw, 725

_____

**11** This case could also be seen as a false certification case because the Court noted that the defendants had certified that their bids "were genuine and not sham or collusive." Hess, 317 U.S. at 543.

16

F. Supp. 896 (S.D. Miss. 1989) (no False Claims Act liability for loans obtained through bribes).

Contrary to the district court's decision, in many of the cases cited above the claims that were submitted were not in and of themselves false. In each of the false certification cases the actual "claim" submitted was not false. In Island Village the HUD housing was actually constructed at fair cost and HUD-qualified purchasers actually moved in; and in Thompson and Pogue the medical services were actually necessary and provided at fair costs. In Marcus , CFW, and Dyncorp, the work contracted for was actually performed to specifications at the price agreed. False Claims Act liability attached, however, because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder.

As the above cases illustrate, the district court's interpretation of the phrase "false or fraudulent claim" was erroneous. The phrase "false or fraudulent claim" in the False Claims Act should be construed broadly. The False Claims Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. ... [T]he Court has consistently refused to accept a rigid, restrictive reading ...." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968) (citation and footnotes omitted). The False Claims Act "reaches beyond `claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." Id. at 233. Thus, any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach. The test for False Claims Act liability distilled from the statute and the sources discussed above is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a "claim").

III.

Count 3: In Count 3(a), Harrison alleges that WSRC lied about the scope of the GPC subcontract in order to get the DOE to approve a sole-source extension of the subcontract for $880,000. In Count 3(b),

17

Harrison alleges that WSRC submitted claims for work that was beyond the scope of the contract.

WSRC challenges these claims on several bases. First, WSRC notes that the DOE was in possession of a copy of the GPC contract when WSRC submitted the claims in Count 3(b) and the contract extension proposal in Count 3(a) and was thus fully capable of agreeing or disagreeing with WSRC's interpretation of the contract terms. WSRC also argues that these misstatements do not meet Berge's materiality requirement.

A close reading of the materials relied upon by Harrison leads to the conclusion that all of Count 3 must be dismissed. The DOE's approval statement indicates that even if WSRC had lied, this was immaterial to the DOE's sole-source extension. The DOE granted a sole source extension of $880,000 for procedure development because it was convinced that changes in the "expectations and regulatory requirements" forced a "complete upgrade of the ITP procedure system." (J.A. at 48.) The DOE did cite to the allegedly false inclusion of 5% procedure development in the GPC subcontract when it approved the $880,000 sole-source extension. (J.A. at 49). But its approval was for much more than a 5% extension; the DOE was specifically altering the original scope of work to meet the changed circumstances. Whether the original GPC subcontract had contained a provision for zero or 5% procedure development was simply immaterial to the DOE's decision.

As for Count 3(b), WSRC's argument is persuasive. The DOE was aware of the terms of the contract -- it could have objected to the inclusion of procedure development costs if it had believed that such work was not authorized. Harrison does not allege that WSRC tried to conceal the nature of the work. Thus, Counts 3(a) and (b) do not involve any material falsity, if any falsity at all.

Count 4 was properly dismissed. Harrison does not state which signature was fraudulent or unauthorized, nor who perpetrated the fraud, nor how the signature was fraudulent. He thus fails Rule 9(b)'s pleading requirements.

Also, even if Harrison had pled fraud with the requisite particularity, a falsified signature on a form, not itself a claim for payment, not

18

apparently required for payment, and not connected to substantive conditions required for payment, is not material under <u>Berge</u>.

<u>Count 5</u> was properly dismissed. The allegations of breaches of contractual and fiduciary duty amount to no more than allegations of poor and inefficient management of contractual duties. The district court was correct in holding that poor, or to use Harrison's term, "non-cost-effective," (Amended Complaint ¶ 25(f)), management is not actionable under the False Claims Act. Moreover, Harrison does not describe with particularity who made misrepresentations, when they made them, nor the manner in which they were made. These are general allegations and fail Rule 9(b)'s heightened pleading requirements.

<u>Count 7</u> was properly dismissed. Count 7, read in the most charitable light, alleges that WSRC and GPC conspired to replace two lower salaried workers with two higher salaried workers so that they could charge the DOE more money for the subcontract. Count 7 fails for a number of reasons. First, Count 7 does not plead an intent to defraud -- nowhere does Harrison assert that WSRC and GPC originally intended to use the removed lower-salaried workers on the subcontract; Harrison alleges merely that they were in fact used. Staffing changes are common, and we should be very hesitant to allow such a claim to stand lest we impose unnecessary regimentation on government contractor staffing decisions. Second, Harrison in fact pleads no facts that could amount to fraud -- the higher salaried workers used for the bid proposal were actually staffed on the GPC subcontract.

<u>Count 8</u> was properly dismissed. Count 8 utterly fails Rule 9(b)'s demand for particularity. Count 8 does not say or even hint who ordered the subcontractors to purchase items, which subcontractors were so ordered, when they were ordered, nor what they were ordered to purchase. Harrison tries to cover up this deficiency by using an illustrative example (fully-furnished double-wide trailers), which he does not even allege was one of the items at issue in the allegations. (Amended Complaint ¶ 33.) The "clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed." <u>United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.</u>, 755 F. Supp. 1040, 1052 (S.D. Ga. 1990), <u>on reconsideration Stinson,</u>

19

Lyons, 755 F. Supp. 1055 (internal quotation omitted). Harrison appears to be on a fishing expedition with this claim.

Count 9 was properly dismissed. This allegation simply does not state a violation of the False Claims Act. Nowhere does it state that a claim of any sort was presented to the DOE or that payments were made contingent upon representations by the Defendant or upon compliance with the "conditions" in the regulation cited by Harrison. Again, this count amounts to no more than an allegation of poor management, which, as the district court noted, is not cognizable under the False Claims Act.

Count 10 was also properly dismissed. Count 10 alleges a conspiracy to routinely "sole source" modifications of the ITP Training Project contract, in violation of the DOE regulations requiring competitive bidding. First, Harrison raises this claim only in his brief. Harrison argues that the claim was always there in the documents filed with the complaint and that a court can consider these documents. See Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017 (5th Cir. 1996); United States ex rel. McCoy v. California Medical Review, Inc., 723 F. Supp. 1363, 1367 (N.D. Cal. 1989). Even so, a court cannot be expected to parse through 1400 pages of documents, as Harrison submitted to the district court below, in order to invent a claim whole cloth for the plaintiff. Second, to the extent that an allegation of a conspiracy to fraudulently sole source can be gleaned from his complaint (cf. Amended Complaint ¶¶ 27, 37), this allegation fails Rule 9(b)'s requirements since Harrison did not plead how sole-sourcing was accomplished in a fraudulent way, what false statements were made to induce sole-sourcing, when they were made, by whom, etc. Therefore, insofar as Count 10 alleges a conspiracy to extend the ITP Training Contract by fraudulently-induced approvals for sole-sourcing, we refuse to consider this newly-raised and vaguely pled allegation.

The remaining claims need a closer analysis.

Count 1 and Count 6 will be treated together since they revolve around the same issues.[12] Counts 1 and 6 basically allege that WSRC

_____

[12] Count 1(e) must be dismissed. Count 1(e) asserts that WSRC misrepresented that it would offer the ITP Training subcontract on a firm-fixed-

20

submitted false information to the DOE so that the DOE would allow WSRC to subcontract the ITP Training Project. This false information included representations that (1) the need for the job was one-time and short-term, so it did not make sense for WSRC to use its own employees, even though they were cheaper; (2) the subcontractor would incur zero "Other Direct Costs"; and (3) the subcontractor's overhead costs would be a certain amount, when WSRC knew that these would be substantially higher.**13** WSRC submitted all of these misrepresentations to the DOE in either the "Make or Buy Analysis" or the PUR package, both of which were used by the DOE to evaluate whether or not to approve subcontracting and the particular subcontractor.

Relying on a mixture of false certification and fraud-in-the-inducement cases discussed in section II(B), supra, Harrison asserts that because of these fraudulent misrepresentations to the DOE, WSRC obtained a "fraudulent approval" for the subcontract and therefore all demands for payments made under the subcontract were false claims. Stated in its strongest form, Harrison alleges that WSRC misrepresented the need for and costs of subcontracting in order to convince the DOE to approve funding for a subcontractor, and this funding was in excess of what the government would have legitimately incurred if WSRC had not made the misrepresentations. Harri-

_____

fee basis when in fact the contract was offered on a cost-plus basis. First, WSRC never represented that it would offer the subcontract on a firm-fixed-fee basis, only that it could. Second, this fact was clearly not material to the DOE's funding decision since the DOE continued with the funding fully aware that the subcontract was let on a cost-plus basis.
**13** In order for liability for representations (2) and (3) to attach, Harrison must prove that WSRC would not have incurred these"other direct costs" or these additional overhead costs had WSRC undertaken the ITP Training Project on its own. If the ITP Training Project was necessary under WSRC's contract with the DOE, and if the "other direct costs" and higher overhead were necessary to the ITP Training Project, regardless of whether WSRC or a subcontractor performed the work, then these alleged falsities could not have been material to the DOE's funding decision. No matter what these costs were, the DOE would have been required to pay them as necessary under the contract.

21

son points out that DOE approval was necessary before WSRC could subcontract out the project.

Under the test developed in section II(B), supra, these alleged falsities are sufficient grounds for a False Claims Act claim to survive a Rule 12(b)(6) motion.

1) False statement. Given that we are reviewing a decision to grant a Rule 12(b)(6) motion, we must take Harrison's allegations as true and accept that the need for ITP Training was more than just "one-time" and "short-term" of no more than 1.5 years, and that the overhead and "Other Direct Cost" cost-estimates were under-estimated. Thus, Harrison submitted false statements to the DOE.

2) Requisite scienter. Again, we must take Harrison's allegations as true, that WSRC in fact knew that the above statements were false.

3) Materiality. Harrison argues that WSRC's false statements meet Berge's test for materiality in that they would have a "natural tendency to influence" the DOE's decision whether to approve the subcontract. See Berge, 104 F.3d at 1549.

WSRC argues that the allegedly false statements in Counts 1 and 6 were immaterial to the DOE's decision to pay for the ITP Training Project. First, WSRC argues that (1) Harrison's own allegations show that ITP Training was necessary to WSRC's contract with the DOE; (2) the DOE was bound by the contract to pay WSRC's costs in performing tasks necessary to that contract; therefore (3) the allegedly false statements could not have been material to the DOE's decision to pay. This argument by WSRC misconstrues Harrison's complaint, however. Harrison does not argue that any claim submitted by WSRC for ITP Training would be a false claim. Harrison argues that when a contractor knowingly makes a misrepresentation to the government about the need to hire, and the cost of hiring, a subcontractor to perform a particular service, and the government is induced by these misrepresentations ultimately to pay more than it otherwise would have for the service, then the claims for payment to the subcontractor are false claims. Under this theory, the false statements were material to the government's decision to pay a higher price for a subcontractor than it would have had to pay to WSRC.

22

WSRC's second materiality argument also fails. WSRC argues that there was no material connection between the DOE's approval and the allegedly false statements because the DOE knew that subcontracting would be more expensive than performing the ITP Training Project in-house. WSRC's own estimates submitted to the DOE stated that subcontracting would be more expensive than"making" the ITP Training Project in-house; nonetheless the DOE approved WSRC's request to subcontract. Thus, says WSRC, the DOE's approval was based only on the lack of in-house personnel at WSRC, not statements about the cost or duration of the project.

The above argument by WSRC misses its mark. Even if the DOE's decision to allow subcontracting was only predicated on WSRC's alleged lack of personnel, and even if WSRC actually lacked personnel (Harrison never alleges otherwise), Harrison has still alleged material falsities. WSRC submitted to the DOE that, even though subcontracting was more expensive than performing the task in-house, WSRC did not currently have the personnel. To make its request more persuasive, WSRC allegedly low-balled the cost of hiring a subcontractor. WSRC stated to the DOE that subcontracting rather than hiring more staff (which would have been cheaper) was necessary for two reasons: (1) because of the short-term nature of the ITP Training Project, permanent staff should not be hired, and (2) in order to prevent interruptions in training. The only rational reason why the DOE would have approved paying a higher price to a subcontractor is that it believed at least one of the two reasons offered by WSRC.

Harrison has alleged only that the first of these two reasons was false. Berge indicates that questions of materiality "partak[e] of the character of a mixed question of fact and law." 104 F.3d at 1460. On the pleadings, it is difficult to say whether or not WSRC's allegedly false statement was material to the DOE's funding decision, since there was another potential basis for the DOE to rely upon in making its decision. At the very least, however, at this 12(b)(6) stage we can say that WSRC's allegedly false statement with respect to the short-term nature of the project was "capable of influencing agency action." See id. at 1459.

Finally WSRC argues that WSRC's statements cannot create False Claims Act liability because they were only estimates. Expressions of

23

opinion are not actionable as fraud; fraud may only be found in expressions of fact which "(1) admit[ ] of being adjudged true or false in a way that (2) admit[ ] of empirical verification." <u>Presidio Enters., Inc. v. Warner Bros. Distributing Corp.</u>, 784 F.2d 674, 679 (5th Cir. 1986). <u>See also Boisjoly v. Morton Thiokol, Inc.</u>, 706 F. Supp. 795, 810 (D. Utah 1988) (no False Claims Act liability for statement "clearly not a statement of fact that can be said to be either true or false"). The fact that cost figures are clearly marked as estimates might affect their ability to influence agency decision-making under the <u>Berge</u> materiality standard. However, an opinion or estimate carries with it "an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." W. Page Keeton, <u>et al.</u>, Prosser & Keeton on the Law of Torts § 109, at 760 (5th ed. 1984). Harrison has alleged that WSRC knew each of these statements was false. The DOE could have been influenced by each of them under the legally reasonable belief that WSRC did not know its own estimates were false.

4) <u>Involved a claim.</u> WSRC submitted numerous invoices for reimbursement of the amounts it paid out to the subcontractor for the ITP Training Project, each of which constitutes a "claim" under the False Claims Act. The fraud-in-the-inducement cases discussed in section II(B), <u>supra</u>, provide sufficient legal precedent for Harrison's complaint in Counts 1(a)-(d) and 6 to survive the Rule 12(b)(6) motion. WSRC argues that the fraud-in-the-inducement cases may be distinguished because in those cases the defendant was the recipient and beneficiary of the contract that was fraudulently obtained.**14** WSRC is correct in portraying the facts of each of the fraud-in-the-inducement cases. WSRC does not explain why this fact was relevant to those decisions, however. In none of those cases did the courts indicate that False Claims Act liability was contingent upon the defendant's status as recipient and beneficiary of the contract. More importantly, the language of the False Claims Act statute does not anywhere state that False Claims Act liability depends upon a defendant's status as a recipient or beneficiary of the fraudulently induced contract. All that

_____

14 Although Harrison argues that WSRC benefitted by increasing its costs under its contract with the DOE, WSRC challenges this assertion, arguing that WSRC received no benefit from increasing its costs under its contract with the DOE.

24

is required is the submission of a false claim. In this case, similar to the facts in, e.g., United States ex rel. Marcus v. Hess, 317 U.S. 537, United States v. General Dynamics Corp., 19 F.3d 770, and United States ex rel. Hagood v. Sonoma County Water Agency , 929 F.2d 1416, defendant WSRC allegedly made misrepresentations to the government about a matter material to the award of a contract and therefore:

> [the] fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government].

United States ex rel. Marcus v. Hess, 317 U.S. at 543. Therefore, the district court's decision with respect to Counts 1(a)-(d) and 6 must be reversed and the case remanded for further proceedings on these claims.

Count 2. We dispose of Count 2(b) first. In Count 2(b), Harrison asserts essentially that WSRC was under a continuing duty to report undisclosed conflicts of interest to the DOE when the GPC subcontract was expanded. WSRC argues that there was no duty, particularly in the absence of a request from the DOE. We affirm the district court's dismissal of Count 2(b). Harrison has not alleged that the DOE made any requests for further certifications or that WSRC actually made such certifications. Nor has Harrison alleged that the DOE conditioned approval of later extensions of the GPC subcontract, or payments thereunder, upon continuing conflicts disclosures. To the extent that Harrison is asserting an implied certification by silence, see note 8, supra, Harrison's claim fails on the pleadings because he has never asserted that such implied certifications were in any way related to, let alone prerequisites for, receiving continued funding. See Thompson, 125 F.3d at 902; Joslin, 984 F. Supp. at 383-84.

In Count 2(a), Harrison asserts that WSRC falsely certified that there were no conflicts of interest between GPC and WSRC. This claim fits squarely into the false certification cases discussed in section II(B), supra, and will be discussed further below.

1) False Statement. Taking Harrison's allegations as true, there was a false statement made to the DOE about a lack of conflicts of

25

interest. Complicating the matter, though, this statement was made directly by GPC to WSRC, not by WSRC to the DOE. WSRC argues that GPC's allegedly false certification cannot be attributed to WSRC because the statement was made by GPC to WSRC about a contract separate from WSRC's contract with the DOE. WSRC merely passed along GPC's false certification to the DOE. In this situation, where the prime contractor allegedly knows that a material certification by a subcontractor was false, we find as a matter of law that the prime contractor has adopted the subcontractor's certification by submitting it to the government. Therefore, we hold that, if Harrison's complaint is accurate, WSRC was responsible for GPC's false certification.

2) Requisite Scienter. Taking Harrison's allegations as true, when WSRC adopted GPC's certification, this act was undertaken with the requisite scienter.

3) Materiality. The prerequisite standard in the false certification cases is essentially a heightened materiality requirement: the government must have conditioned payment of the claim upon certification of compliance with the provision of the statute, regulation, or contract at issue. See Thompson, 125 F.3d at 902; Joslin, 984 F. Supp. at 383-384. Fairly read in the light most favorable to Harrison, see Mylan Laboratories, Inc., 7 F.3d at 1134, Harrison's complaint asserts that WSRC was required to certify that there was no conflict of interest in order to obtain the DOE's approval for the GPC subcontract. On review of the district court's Rule 12(b)(6) disposition, we must accept Harrison's pleadings as true. See id.

4) Involved a Claim. If Harrison's allegations in Count 2(a) are true, then WSRC could face False Claims Act liability for each claim submitted as a result of the false certification. The logic, a combination of the false certification and fraud in the inducement theories, would be as follows: This false certification was a pre-requisite to approval of the subcontract. Each claim for payment under the contract was therefore submitted under a contract which was fraudulently approved. So, WSRC could face False Claims Act liability for each claim for payment under the GPC subcontract.

CONCLUSION

Although Harrison may ultimately lack the ability to prevail on the evidence, we do think he has stated potential claims under Counts

1(a)-(d), 6, and 2(a). Harrison has alleged more than just waste and mismanagement. He has alleged that WSRC made intentional misrepresentations to the government, and that WSRC submitted a certification known to be false, about matters material to the government's decision to grant a subcontract. These false statements caused the government to pay "claims" at a higher cost than it would have paid absent the fraud. These allegations are sufficient to state claims under the False Claims Act.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS DISPOSITION

27