**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA EX REL
DAVID D. BENNETT,
Plaintiff-Appellant,

v.                                                                  No. 98-2119

GENETICS & IVF INSTITUTE,
INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-95-1620-JFM)

Argued: March 3, 1999

Decided: October 28, 1999

Before TRAXLER, Circuit Judge,
VOORHEES, United States District Judge
for the Western District of North Carolina, sitting by designation,
and FABER, United States District Judge
for the Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Stephen Simms, GREBER & SIMMS, Baltimore,
Maryland, for Appellant. Ronald Henry Clark, ARENT, FOX, KINT-

NER, PLOTKIN & KAHN, Washington, D.C., for Appellee. **ON BRIEF:** W. Charles Bailey, Jr., GREBER & SIMMS, Baltimore, Maryland; Robin Page West, LAW OFFICES OF ROBIN PAGE WEST, Baltimore, Maryland, for Appellant. Robert E. Wanerman, ARENT, FOX, KINTNER, PLOTKIN & KAHN, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This is a qui tam action filed by David D. Bennett ("Bennett") on behalf of the United States under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3730(b). The district court granted the motion for summary judgment of the defendant, Genetics & IVF Institute, Inc. (the "Institute"). Bennett appealed. Finding no error, we affirm.

I.

In 1991, 1994 and 1997, through contracts bid competitively under the procurement laws of Virginia, the Institute undertook to provide services for federally-funded paternity testing. Federal funding was provided pursuant to the Child Support and Establishment of Paternity Program under the Social Security Act, 42 U.S.C. § 651, et seq. The purpose of this program is to decrease the number of fathers who refuse to support their children because paternity has not been conclusively established.

The request for proposal ("RFP"), which became part of the contract, obligated the Institute to: (1) draw two tubes of blood from each person tested -- the mother, child and putative father -- for a total of six tubes of blood for each group or case; (2) perform a pater-

2

nity test for each group; and (3) perform a second paternity test for each group in which the first test indicated the man was not the father.

The contract allowed a twenty-one-day window in which to complete the initial test and any retest. Each test takes thirteen to fifteen days to complete; therefore, in order to meet the time frame under the contract, a second test would have to be run simultaneously with the first in every case. Instead of providing six tubes of blood and two tests, the Institute provided only three tubes of blood and one test.

The operative pleading before the district court was Bennett's third amended complaint, filed on August 18, 1997. The third amended complaint had three counts. Count I charged that the Institute knowingly submitted false claims under the paternity testing contract. Count II alleged that the Institute paid illegal kickbacks to a military employee of the Bethesda Naval Hospital who later joined the Institute staff. The third count charged that the Institute had violated the Stark law, 42 U.S.C. § 1395nn, in connection with its internal laboratory testing of tissue samples submitted by staff physicians.

Both Bennett and the Institute filed motions and cross-motions for summary judgment. On July 10, 1998, the district court, ruling from the bench at oral argument, granted summary judgment for the Institute on Counts I and II of the third amended complaint. As to Count I of the amended complaint, the court ruled that undisputed facts of record showed that the Institute lacked the requisite fraudulent intent for liability to attach under the False Claims Act. With regard to Count II, the court held that Bennett had raised the claim too late in the proceedings. At oral argument, Bennett admitted that Count II as originally filed was defective. He attempted to salvage this count by asserting, in his brief in opposition to the Institute's motion for summary judgment, a new theory to support it. He did not move to amend Count II under Rule 15(a); he simply argued that the court should permit him to amend to conform to the evidence as permitted by Rule 15(b). The trial court rejected this argument finding that Bennett was asserting an entirely new theory. While the trial court did not expressly say the Institute would be prejudiced by the proposed amendment, the implication is clear. The new theory, said the court, would require new discovery and a different focus of the litigation. As such, the court held, it came "simply too late" in the case. Bennett

3

voluntarily moved to dismiss Count III under Federal Rule of Civil Procedure 41(a). The Institute opposed that motion and, at oral argument, the district court dismissed Count III with prejudice as to the relator, Bennett, but not as to the United States. Bennett immediately filed this appeal which seeks review of the district court's order granting summary judgment upon Counts I and II.

We apply a de novo standard of review to the trial court's grant of summary judgment on Count I. Helm v. Western Md. Ry. Co., 838 F.2d 729, 734 (4th Cir. 1988). An abuse of discretion standard applies to the trial court's refusal to permit amendment of Count II. Gladhill v. General Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984).

II.

Qui tam suits predate the Republic. A discussion of the long history of the practice is found in Marvin v. Trout, 199 U.S. 212 (1905). The relator in a qui tam action is essentially a self-appointed private attorney general, and his recovery is analogous to a lawyer's contingent fee. The relator has no stake in the damages sought, all of which have been incurred by the government. United States v. Univ. of Tex. M.D. Anderson Cancer Center, 961 F.2d 46, 49 (4th Cir. 1992).

The False Claims Act was originally passed during the Civil War as a response to abuses by defense contractors. Congress hoped that the act, and the qui tam actions it provided for, would help the government uncover fraud and abuse. The Act allows a private action on behalf of the government against anyone who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government.

In order to prevail in an action brought under the False Claims Act, a litigant is required to show the following: (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) that such action was taken with the requisite scienter; (3) that the false claim was material; and (4) that the false claim caused, or could have caused, the government to incur expenses or to forfeit monies due. Harrison v. Westinghouse Savannah River Co. , 176 F.3d 776,

4

778 (4th Cir. 1999). The False Claims Act establishes that actions must be taken "knowingly" in order to meet the requisite scienter, and the term has a special meaning within the context of the False Claims Act. Under the False Claims Act "knowing" and"knowingly" mean that a person with respect to pertinent information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required.

Liability under the False Claims Act is subject further to the judicially imposed requirement that the false statement or claim be material. Materiality depends on "whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala., 104 F.3d 1453, 1460 (4th Cir.), cert. denied, 118 S. Ct. 301 (1997).

The district court held, and we agree, that the evidence showed there was no intent to defraud. The Commonwealth of Virginia was completely aware from the inception of the contract that the Institute was taking and testing only one sample of blood from each person. Virginia willingly acquiesced in this practice. Before the contract was awarded and, again before performance began, the Institute spoke with officials in Virginia's Division of Child Support Enforcement who administered the paternity testing program and contract. The Institute explained to these employees that the method they proposed to use, DNA testing, would not scientifically require the collection and analysis of two tubes of blood because it was much more accurate than serology testing, the previously used method. Taking additional tubes would only slow down the receipt of the results and both parties to the contract knew this. Additionally, DNA testing, in contrast to serology testing, could be performed on a child at a much younger age, thereby allowing the test to be concluded at a time when it is easier to locate the reputed father. Virginia officials fully approved of the Institute's proposed approach. Additionally, Virginia was apparently pleased with the Institute's performance under the contracts. The 1991 contract was extended several times. The new contract in 1995 was awarded to the Institute. In 1996, after this litigation was filed, Virginia again awarded the Institute the same contract containing a

5

two-tube requirement, although everyone knew that the two-tube requirement was not being satisfied.

On this state of the record, the district court was correct in holding that the evidence conclusively established that the Institute did not possess the requisite intent to deceive. The district court's basis for its decision was that no reasonable jury could conclude that the Institute had the requisite scienter. At a minimum, the False Claims Act requires that the defendant act with reckless disregard as to the falsity of the claim. The evidence shows that the Institute was not reckless in its belief that Virginia had agreed to modify the contract and allow testing of one tube, with retesting only upon request. The evidence shows that before the contract was awarded, and after the contract was awarded but before the performance began, the Institute specifically informed state officials of how it intended to perform under the contract. The evidence also shows that state officials knew that the Institute was not taking two tubes and automatically retesting, and that these officials were nonetheless happy with the Institute's performance.

Additionally, it is doubtful that Bennett could establish that the Institute's claims, even if false, were material under the standard enunciated in Berge. Under Berge, in order for a false claim to be material, it must have a "natural tendency to influence agency action" or be "capable of influencing agency action." Id. at 1460. Here, everyone involved knew that the Institute was not taking two tubes of blood or automatically retesting. None of them cared because all were satisfied with the Institute's performance under the contract as it was. The number of tubes and the automatic retesting requirements of the contract were obviously immaterial to Virginia's decision to renew the contract with the Institute and to pay for the services rendered since such renewal and payment were made with full knowledge of the method under which the Institute was performing.

III.

The relator also appealed from the district court's refusal to allow him to amend Count II of his complaint to offer new theories of Federal Claims Act liability. Bennett first raised his claims in his opposition to the Institute's motion for summary judgment. The court held

6

that the time in which the claims should have been asserted had long since passed and denied the motion to amend.

Our inquiry here is whether the district court abused its discretion in denying Bennett's motion to amend. Gladhill v. General Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984).

A district court has wide discretion in determining whether to permit amendments of pleadings. United States ex rel. Joslin v. Community Home Health of Maryland, Inc., 984 F. Supp. 374, 381 (D. Md. 1997); Deasy v. Hill, 833 F.2d 38, 40 (4th Cir. 1987). Amendments should normally be allowed if there is no unfair prejudice to the opposing party and the motion is not unduly delayed. Bennett offered no justification for the substantial delay in seeking to amend his complaint. He had already been permitted to amend twice and he does not contend that additional evidence supporting his new theory was revealed during discovery. The new theory was an obvious attempt to salvage a defective count at a late hour in the case. The trial court held correctly that Bennett's new claim was not a new theory, but an entirely different claim. The facts underlying these two claims are substantially different. Discovery in the case had been completed, much time had elapsed, and the plaintiff was asserting a new claim that involved new facts, new legal theories and probably new discovery. Under an abuse of discretion standard, we cannot say that the court's decision to deny the amendment was error.

For all these reasons, the decision of the district court is affirmed.

AFFIRMED

7