William T. HANCOCK, Sr., Individually and in a representative capacity on behalf of a class of persons similarly situated, Plaintiff,

v.

AMERICO FINANCIAL LIFE AND ANNUITY INSURANCE COMPANY, Investors Life Insurance Company of North America, and Americo Life, Inc., Defendants.

NO. 7:16–CV–350–FL

United States District Court, E.D. North Carolina, Southern Division.

Signed 07/25/2017

H. Forest Horne, Jr., Karl Joseph Amelchenko, John Alan Jones, Martin & Jones, PLLC, Raleigh, NC, for Plaintiff.

Carl C. Scherz, Roger B. Cowie, Taylor F. Brinkman, Locke Lord LLP, Dallas, TX, Debbie Weston Harden, Jackson R. Price, Meredith J. McKee, Womble Carlyle Sandridge & Rice, LLP, Charlotte, NC, for Defendant.

## ORDER

LOUISE W. FLANAGAN, United States District Judge

This matter is before the court on defendant's motion to dismiss for failure to state a claim (DE 17). Briefing having been completed, the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted.

## BACKGROUND

Plaintiff commenced this action on October 14, 2016, asserting claims against defendants arising from the sale by defendant Investors Life Insurance Company of North America ("Investors Life") of a policy of life insurance to plaintiff in February 1985, policy number 303 1163280 (the "policy"), and collection of premiums thereunder through October 2013. Plaintiff claims that defendant Investors Life, in conjunction with the other defendants who are allegedly affiliated entities, breached the terms of the policy. Plaintiff asserts claims for breach of contract; declaration and injunction; equitable rescission; unjust enrichment and constructive trust; fraudulent suppression and concealment; fraud; breach of duties of good faith and fair dealing; unfair and deceptive trade practices; and violations of North Carolina's Racketeer Influenced and Corrupt Organizations (RICO) act. Plaintiff seeks compensatory and punitive damages and certification of the case as a class action on behalf of himself and all others similarly situated.

Defendants filed the instant motion to dismiss on December 9, 2016, asserting that all claims fail as a matter of law and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The court stayed scheduling activities pending decision on the motion. Plaintiff responded in opposition to the instant motion on January 20, 2017, and defendants replied on February 3, 2017.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. On February 6,

1985, plaintiff, then 33 years old, applied for a "Flexible Premium Adjustable Life Insurance" policy from defendant Investors Life (the "policy"). (DE 1–2 at 1; see DE 1–2 at 24–25).[1] On February 15, 1985, defendant Investors Life issued the policy to plaintiff. A cover letter to the policy, titled "Flexible Premium Adjustable Life Insurance Policy" states, inter alia "We agree to pay the Cash Value to the Owner on the Maturity Date if the Insured is living on that date. All payments made are subject to the policy provisions." (Id.). The next page includes a table of contents. (Id. at 2).

A "policy specifications" page follows, stating that the "initial specified amount" is $50,000.00 and the "minimum initial premium" is $41.27. (Id. at 3). It also includes the following note and information:

```
NOTE: THE MATURITY DATE IS THE POLICY ANNIVERSARY NEAREST THE INSURED'S
MINETY-FIFTH BIRTHDAY. THE AMOUNT OF CASH VALUE PAYABLE ON THE MATURITY
DATE DEPENDS UPON THE AMOUNT OF PREMIUMS YOU PAY. THERE MAY BE LITTLE CASH
VALUE AVAILABLE ON THE MATURITY DATE. COVERAGE WILL END PRIOR TO THE
MATURITY DATE, SHOWN WHERE EITHER NO PREMIUMS ARE PAID FOLLOWING PAYMENT OF
THE INITIAL PREMIUM OR SUBSEQUENT PREMIUMS ARE INSUFFICIENT TO CONTINUE
COVERAGE TO SUCH DATE.

POLICY NUMBER 'V/' 1163280 DATE OF ISSUE FEBRUARY 15, 1985

MONTHLY ANNIVERSARY DAY 15 MATURITY DATE FEBRUARY 15, 2047

INSURED WILLIAM T HADLOCK, SR SPECIFIED AMOUNT $ 50,000

AGE AT ISSUE 33 SEX MALE

PLANNED PERIODIC PREMIUM $41.27 PAYABLE MONTHLY
```

(Id.). The next four pages comprise a "Table of Expense Charges," "Table of Surrender Charges," "Insured Table of Guaranteed Maximum Insurance Rates Per $1000," and "Other Insured Table of Guaranteed Maximum Insurance Rates Per $1000." (DE 1–2 at 4–7).

The next page contains "general provisions" including the following:

court's Case Management / Electronic Case Filing (CM/ECF) system, and not the page number printed on the face of the original document (e.g., "Page 3A").

---

1. In citations to the policy, the court specifies the page number(s) of the document filed on the court's docket (e.g., DE 1–2 at 4), shown superimposed on the filed document by the

> **THE CONTRACT**
>
> This is your policy. We issued it in consideration of your application and your payment of the minimum initial premium. This policy and the application (and any supplemental application for additional Specified Amounts) make up the whole contract. We agree not to use any statements other than those made in the application or in a supplemental application in challenging a claim or attempting to avoid liability under this policy. The statements made in the application and supplemental applications will be treated as representations and not as warranties. A copy of the application or supplemental application is attached to this policy when issued, or is made part of the policy when changes in the Specified Amount become effective.

(id. at 8), and the following:

> **PROCEEDS**
>
> Proceeds, as used in this policy, means the amount payable on the Maturity Date; on the surrender of this policy before the Maturity Date; or upon the death of the Insured.
>
> The proceeds payable on the death of the Insured shall be the Insured's death benefit, less any indebtedness (money owed the Company). If the policy is surrendered before the Maturity Date, the proceeds shall be the cash surrender value described in the Nonforfeiture Provisions section, less any Indebtedness. On the Maturity Date, the proceeds shall be the cash value, less any indebtedness. The proceeds are subject to the adjustments described in the following provisions:
>
> 1. Misstatement of Age or Sex;
> 2. Incontestability;
> 3. Suicide Exclusions;
> 4. Surrender and Cash Surrender Value;
> 5. Partial Surrender;
> 6. Grace Period; and
> 7. Indebtedness.

(Id.). The next two pages cover "exclusions," "ownership and beneficiary," and "premiums," including the following provisions regarding premiums:

## 6 · PREMIUMS

The Date of Issue is the date from which Monthly Anniversary Days, policy months, policy years, and policy anniversaries are determined. The minimum initial premium is due on the Date of Issue. You may pay more than the minimum initial premium on the Date of Issue. But we have the right to limit the amount. Future premiums are payable in advance at our Administrative Office. You may pay future premiums in any amount at any time before the Maturity Date, subject to the limitations described below.

### PLANNED PERIODIC PREMIUMS

Unless you tell us something else in writing, we will send you periodic premium reminder notices for the amount and in the frequency shown on the Policy Specifications page. We have the right to stop sending such notices if we do not receive any premium payment for thirteen policy months. Changes in the amounts or frequency of planned periodic premium payments and payment reminder notices will be subject to our approval. You may change the planned periodic premium to any amount not less than $20. You may not change the planned periodic premium more than twice in a policy year.

(id. at 9), and the following:

**UNSCHEDULED PREMIUMS**

You may make unscheduled premium payments. They must be at least $100. There must be no indebtedness. We have the right to limit the amount of such payments. We have the right to limit the number of such payments.

**GRACE PERIOD**

If the cash value, less any Indebtedness, on the date before a Monthly Anniversary Day is less than the monthly deduction for the month after that Monthly Anniversary Day, you will have a grace period of 61 days from that Monthly Anniversary Day to pay a premium which is enough to cover that monthly deduction. The cash value and monthly deduction are described in the Nonforfeiture Provisions section. If such premium is not paid within the grace period, all coverage under this policy will end at the end of the grace period. We will mail to the last known address of you and any assignee of record a written notice of insufficient cash value at least 31 days before the end of the grace period. If the Insured dies during the grace period, we will deduct any overdue monthly deductions from the benefits.

(id. at 10). A subsequent section of the policy titled "nonforfeiture provisions" includes the following additional provisions, pertaining to "cash value" and deductions therefrom:

**CASH VALUE**

On each Monthly Anniversary Day, the cash value shall be calculated as (1), plus (2), plus (3), minus (4) where:

(1) is the cash value on the prior Monthly Anniversary Day

(2) is all premiums received since the prior Monthly Anniversary Day.

(3) is interest on items (1) and (2).

If premium is received at any time other than the start of a policy month, the rate of interest will be determined pro rata from the date of receipt.

(4) is the monthly deduction for the month after the Monthly Anniversary Day

On a day other than a Monthly Anniversary Day, the cash value shall be the cash value as of the prior Monthly Anniversary Day, plus all premiums received since the prior Monthly Anniversary Day, increased by interest. The cash value on the Date of Issue shall be the initial premium received, less the monthly deduction for the policy month after the Date of Issue.

(Id. at 12). The "interest" rate is defined as set forth in the following provision:

**INTEREST RATE**

The guaranteed interest rate applied in the calculation of cash value is .32737 percent per policy month, compounded monthly. This is the same as 4 percent per year, compounded yearly.

Interest in excess of the guaranteed rate may be applied in the calculation of cash values. Such increased rates will be set in such manner as we may determine. They may change from time to time, but not below the guaranteed rate.

A different rate of interest may be applied to the part of the cash value which secures a policy loan. This rate will not be less than the guaranteed interest rate of .32737 percent per policy month.

(Id.). In addition, the "monthly deduction" is defined as including a charge for "cost of insurance" calculated as set forth in the following provision:

> **COST OF INSURANCE RATES**
>
> The monthly cost of insurance rate is based on the sex, age on the prior policy anniversary, and premium class of the insured. Monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality of people in the same class. Any change in cost of insurance rates will apply to all people of the same class as the insured. The cost of insurance rates will never be more than those shown on the Insured Table of Guaranteed Maximum Insurance Rates page. Such guaranteed maximum rates are based on the 1958 Commissioners' Standard Ordinary Mortality Table, Age Nearest Birthday; plus any risk factors for any rated premium class.

(Id. at 13). The table referenced is one of the four initial tables at the front of the policy, which shows the cost of insurance for each age group, between 0 and 94 years. For example, the rate for age 33 (plaintiff's age at policy inception) is 0.29008, whereas the rate for age 65 (plaintiff's age at filing of complaint) is 3.98456. (Id. at 6).

The policy then includes the following further provisions regarding cash value:

> **INSUFFICIENT CASH VALUE**
>
> If the cash value, less any Indebtedness, on the day before a Monthly Anniversary Day is not enough to cover the monthly deduction for the month after such Monthly Anniversary Day, the policy will end as povided in the Grace Period provision.
>
> **CONTINUATION OF INSURANCE**
>
> In the event planned periodic premium payments are not continued, insurance coverage under this policy and benefits provided by rider will be continued until the cash value, less any Indebtedness, is not enough to cover the monthly deduction, except as provided in the Grace Period provision. This provision shall not continue the policy beyond the Maturity Date. It will not continue riders beyond the date for their termination, except as provided in the riders. At the Maturity Date, we will pay you the cash value if the Insured is living.

(Id. at 13). The remainder of the policy includes provisions concerning surrender, policy loans, settlement options, a waiver of monthly deduction disability benefit rider, an other insured convertible term insurance rider, and a children's term life insurance rider. (See id. at 13–23).

Subsequent to issuance of the policy, defendant Investors Life began to increase plaintiff's premium. Plaintiff first became aware of this increase via communications with defendant Investors Life in October 2013. "Unbeknownst to [plaintiff], Investors Life had increased his premiums over a decade earlier, and had been taking mon-

ey out of the cash value of the policy to cover the difference between the $44.62 (after a rider was added increasing the initial $41.27 premium) he continued to pay every month and the ever increasing premiums [defendant] Investors Life was charging." (Compl. ¶ 53). Plaintiff "has lost the entire accumulated cash value of the policy, as well as seen his premium payments skyrocket from approximately $41.00 a month to $160.00 a month." (Id.).

Defendant Americo Financial Life and Annuity Insurance Company ("Americo") purchased defendant Investors Life in 2008. (Id. ¶ 4). Defendant Investors Life is a wholly owned subsidiary of Americo. Defendant Americo Life, Inc. ("ALI") is an insurance company or holding company with Missouri as its state of incorporation and principal place of business. (Id. ¶ 5).

## DISCUSSION

### A. Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

### B. Analysis

#### 1. Breach of Contract

Plaintiff asserts that defendants breached the terms of the policy by (1) assessing or requiring premium payments in amounts higher than allowed under the terms of the policy and (2) assessing or requiring cost of insurance charges in excess of those permitted by certain mortality tables. Neither of these asserted actions, however, constitutes a breach of the policy, for the reasons stated below.

Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 363 N.C. 623, 631, 685 S.E.2d 85 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693–94, 51 S.E.2d 191 (1949). "Where a policy defines a term, that definition is to be used. If no definition is given, nontechnical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 505–06, 246 S.E.2d 773 (1978); see Anderson v. Allstate Ins. Co., 266 N.C. 309, 312, 145 S.E.2d 845 (1966).

"Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party

thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631, 224 S.E.2d 580 (1976). "The words used in the policy having been selected by the insurance company, any ambiguity or uncertainty as to their meaning must be resolved in favor of the policyholder, or the beneficiary, and against the company." Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518 (1970). "However, ambiguity in the terms of an insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning." Id. "No ambiguity, calling the above rule of construction into play, exists unless, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Id.

 "[T]he court must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." Id. "Where the immediate context in which words are used is not clearly indicative of the meaning intended, resort may be had to other portions of the policy and all clauses of it are to be construed, if possible, so as to bring them into harmony." Id. at 355, 172 S.E.2d 518. "Each word is deemed to have been put into the policy for a purpose and will be given effect, if that can be done by any reasonable construction in accordance with the foregoing principles." Id.; see Robbins v. C. W. Myers Trading Post, Inc., 253 N.C. 474, 477, 117 S.E.2d 438 (1960).

### a. Premiums

 Plaintiff's breach of contract claim based upon increased premiums fails because the policy allows for increased premiums and sets out circumstances in which increased premiums will be necessary to keep the policy active.

Multiple provisions, read in context of the policy as a whole, allow for increased premiums. The cover of the policy states that it is a "flexible premium adjustable life insurance policy," and it says nothing about premiums remaining constant during the term of the policy. (DE 1–2 at 1). The policy specifications state "the minimum initial premium is $41.27," and the "planned period premium [is] $41.27." (DE 1–2 at 3) (emphasis added). At the middle of the same page, the specifications provide a "note" stating that "the amount of cash value payable on the maturity date depends upon the amount of premiums you pay," and "coverage will end prior to the maturity date shown where ... subsequent premiums are insufficient to continue coverage to date." (Id.) (emphasis added).

These provisions are further informed by additional terms and details in the policies demonstrating that premiums may change. For example, the policy states: "If the cash value, less any Indebtedness, on the day before a Monthly Anniversary Day is not enough to cover the monthly deduction for the month after such Monthly Anniversary Day, the policy will end as provided in the Grace Period provision." (DE 1–2 at 13). That Grace Period provision provides, in turn, "If the cash value, less any Indebtedness, on the date before a Monthly Anniversary Day is less than the monthly deduction for the month after that Monthly Anniversary Day, you will have a grace period of 61 days from that Monthly Anniversary Day to pay a premium which is enough to cover that monthly deduction." (Id. at 10) (emphasis added). As such, the policy states in plain terms

that a premium payment may be needed "which is enough to cover [the] monthly deduction." (Id.). Where the terms "cash value" and "monthly deduction" are further defined in the policy, this provision also points to further details regarding how the premium payment may change.

In particular, "the cash value shall be calculated as (1), plus (2), plus (3), minus (4) where: (1) is the cash value on the prior Monthly Anniversary Day. (2) is all premiums received since the prior Monthly Anniversary Day. (3) is interest on items (1) and (2) .... (4) is the monthly deduction for the month after the Monthly Anniversary Day." (Id. at 12) (emphasis added). In turn, the "monthly deduction" is defined as including a charge for "cost of insurance" calculated according to a table which shows the cost of insurance for each age group, between 0 and 94 years. The rate for age 33 (plaintiff's age at policy inception) is 0.29008, whereas the rate for age 65 (plaintiff's age at filing of complaint) is over ten times that amount, 3.98456. (Id. at 6). The "interest rate" is defined as a "guaranteed interest rate" of "4 percent per year, compounded yearly," which is a guaranteed minimum insurance rate that "may change from time to time, but not below the guaranteed rate." (Id. at 9).

Accordingly, in order to maintain the cash value of the policy, in light of deductions for cost of insurance, premiums necessarily must rise substantially as the cost of insurance increases ten-times in amount over a period of 30 years, unless there is a corresponding rise in interest rate to offset the increase in monthly deduction. As noted by plaintiff in the complaint, "the interest rate applicable to the policy when it took effect in 1985 was 8.75%." (Compl. ¶ 50). Rates did not remain at their initial applicable rate; indeed, "interest rates applicable to the policy cash values would inevitably fall." (Id. ¶ 52). Therefore, premium increases were allowed and nearly inevitable based on the terms of the policy and the interest rates applicable to the policy. As such, defendants did not breach the terms of the policy by increasing plaintiff's premiums.

Plaintiff argues that the policy is ambiguous as to whether premiums can rise, pointing to policy provisions that plaintiff contends suggest otherwise. For example, plaintiff points out that the "monthly deduction" is calculated as the sum of several items, including an "expense charge," which applies only during the first 12 months of the policy term. (DE 21 at 13–14 (citing DE 1–2 at 4)). Accordingly, plaintiff asserts "[a] policyholder reading this might reasonably conclude that after the first twelve months and with no increase in coverage, the monthly deduction would go down over time, not that it would go up nearly fourfold." (DE 21 at 14). Plaintiff contends that a similar inference is warranted if a policyholder has not taken out a loan on the policy. (See id.). A policyholder could only so conclude, however, by ignoring the table of insurance rates at the page 4A of the policy, which plainly shows the cost of insurance increasing significantly and steadily each year. (DE 1–2 at 6). This court cannot interpret the contract in a manner that ignores significant terms therein, but rather must interpret the policy as a whole. Wachovia, 276 N.C. at 354, 172 S.E.2d 518; Robbins, 253 N.C. at 477, 117 S.E.2d 438. Therefore, this example misses the mark.

Plaintiff also notes that the policy includes several provisions describing how a policyholder can change or adjust the amount of premium payments. For example, it states that the policyholder "may change the planned periodic premium to any amount not less than $20," or that the policyholder "may make unscheduled premium payments." (DE 1–2 at 9–10). The

fact that the policyholder can change the amount of premium payments, however, does not extinguish other provisions in the policy that require maintenance of cash value, dependent upon payment of premiums and interest against deductions. (See, e.g., 1–2 at 3 10 (providing grace period to "pay a premium which is enough to cover that monthly deduction"); 12 (defining "cash value" as including premiums received minus monthly deduction); 13 (providing that if planned premium payments are not continued coverage "will be continued until the cash value . . ., is not enough to cover the monthly deduction")). Therefore, the examples plaintiff cites do not restrict defendant's ability to increase premiums under the policy.

Plaintiff suggests that an increase in premiums should not be allowed under the policy without a plain disclosure or illustration of the risk thereof. For example, plaintiff contends the policy should have included a disclosure "explaining that your premium may increase, even if you never take out a loan or increase the amount of coverage." (DE 21 at 16). Plaintiff suggests the policy should have "illustrate[d] how declining interest rates combined with rising costs of insurance will deplete the policy cash value, absent dramatic increases in the policy's stated 'planned premium.'" (Id.). Likewise, plaintiff suggests the policy "should have disclosed to the policyholder that this is not a passive policy but, rather, an investment, which should be monitored with changing market interest rates." (Id.). The fact that such disclosures could have been made consistent with the operation of the policy in practice, however, proves the point that there is no breach of the policy due to increased rates.

While plaintiff suggests that such statements or illustrations of the risks of the policy should have been disclosed in the policy to benefit the purchasing consumer, in the vein of a regulatory or statutory protection, such disclosures are not required by contract principles to allow premium increases under the terms of the policy. Accordingly, plaintiff's breach of contract claim premised upon increased premiums must be dismissed as a matter of law.

### b. Cost of Insurance

Plaintiff also asserts that defendants breached the terms of the policy by "wrongfully and improperly assessing or requiring cost of insurance charges in excess of those permitted by mortality tables." (Compl. ¶ 81). Plaintiff recognizes that the policy specifically defines the charges defendants may deduct as cost of insurance charges. (See id. at ¶ 44; see, e.g., DE 1–2 at 6). As such this claim "is not based on the language of the contract, but rather on whether Defendants performed under the contract." (DE 21 at 18). Plaintiff however, does not allege facts that permit a plausible inference that defendant charged a cost of insurance rate any different from what was specified in the policy. Thus, plaintiff's breach of contract claim on this basis fails for lack of sufficient factual allegations to nudge the claim "across the line from conceivable to plausible." Bell Atl. Corp., 550 U.S. at 547, 127 S.Ct. 1955.

Plaintiff suggests, nonetheless, apparently in the alternative that defendants failed to follow certain regulatory or industry standards in the amount of cost of insurance rates that they charged. For example, plaintiff asserts in his brief that "[d]efendants' [cost of insurance] charges are of such an amount that, upon information and belief, they are inconsistent with industry-accepted determinations and, consequently, in excess of true mortality costs." (DE 21 at 18). North Carolina contract law, however, requires that the court determine what the contract requires, not

what insurance regulations or industry-accepted standards require. See Wachovia, 276 N.C. at 354, 172 S.E.2d 518; Robbins, 253 N.C. at 477, 117 S.E.2d 438. Thus, where plaintiff has not alleged facts giving rise to a plausible inference that defendants breached the terms of the contract, plaintiff's breach of contract claim on the basis of cost of insurance charges must be dismissed without prejudice.

In sum, plaintiff's breach of contract claim must be dismissed as a matter of law for failure to state a claim upon which relief can be granted. As a result, plaintiff's claims for declaration and injunction (count 2), equitable rescission (count 3), and unjust enrichment and constructive trust (count 4), premised upon the same contractual arguments must be dismissed.

### 2. Breach of Duties of Good Faith and Fair Dealing

Plaintiff claims that defendants breached duties of good faith and fair dealing by 1) engaging in unfair and deceptive trade practices, 2) selling life insurance policies without disclosing "that the policy premiums remaining unchanged was completely dependent on interest rates remaining at abnormally high levels" and 3) failing to disclose "that such policies were likely to lapse or lose their value unless plaintiff and class members paid significantly higher premiums as interest rates fell." (Compl. ¶ 105).

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299 (1985). "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C.App. 743, 746, 253 S.E.2d 625 (1979). However, an asserted implied term cannot be used to contradict the express terms of a contract. See Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713, 124 S.E.2d 905 (1962) ("[A]n express contract precludes an implied contract with reference to the same matter.").

Here, plaintiff's claim for breach of implied duty fails because plaintiff has not alleged facts permitting a plausible inference that defendants did "anything which injures the right of the other to receive the benefits of the agreement." Bell, 314 N.C. at 228, 333 S.E.2d 299. Plaintiff has not alleged that defendants took any action that prevented plaintiff from receiving benefits of the policy, according to the terms of the policy. Rather, plaintiff seeks relief based upon asserted implied terms that are not required by the express terms of the contract, as discussed above with respect to plaintiff's breach of contract claims. North Carolina law does not permit such a claim where the express terms of the policy preclude an implied contract with reference to the same matter. See Vetco, 256 N.C. at 713, 124 S.E.2d 905.

Plaintiff suggests that an insurance company owes an exceptional duty of good faith under the law towards its insured, which defendants breached in this case. As a general rule, however, "[a]n insurance company is not a trustee for its insured." Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126 S.E.2d 135 (1962). The case cited by plaintiff for a contrary rule, Richardson v. Bank of Am., N.A., 182 N.C.App. 531, 558, 643 S.E.2d 410 (2007), is inapposite because it involved the sale of insurance products that undisputedly were illegal. See id. ("We hold that by selling an unlawful insurance product to Plaintiffs

with loans greater than fifteen years, NationsCredit breached its duty of good faith and fair dealing as a matter of law.").

Accordingly, plaintiff's claim for breach of implied duty of good faith and fair dealing fails as a matter of law.

### 3. Tort Claims

Plaintiff asserts claims of fraud (counts five and six), North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") (count eight), and RICO (count nine). Defendant seeks dismissal of plaintiff's tort claims on the basis that they are not distinct from breach of contract, and on the basis that plaintiff has failed to plead them with the requisite specificity, among other grounds. For the reasons stated below, the court agrees as to both grounds for dismissal and thus need not reach the additional grounds raised by defendants.

 Where a cause of action presumes the "existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement," the issues raised must be relegated to the arena of contract law, and are not appropriate for resolution under tort principles. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998). Under North Carolina law, the court must "limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim." Id. at 346 (quoting Newton v. Standard Fire Ins. Co., 291 N.C. 105, 111, 229 S.E.2d 297 (1976)). Furthermore, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Strum v. Exxon Co., U.S.A., 15 F.3d 327, 333 (4th Cir. 1994); see N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 83, 240 S.E.2d

345 (1978) ("[O]ur research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill."); Taylor v. United States, 89 F.Supp.3d 766, 773 (E.D.N.C. 2014) ("[A] defendant's conduct in exercising perceived rights and remedies under a contractual agreement with another party, even if allegedly contrary to the to the terms of the agreement, does not form the basis for a UDTPA claim.").

 Here, plaintiff's tort claims are based upon the alleged concealment by defendants of certain facts concerning the operation of the policy. For example, plaintiff alleges that defendants concealed that:

1) "premiums would not remain fixed and level throughout the life of the [policy];"

2) "Plaintiff ... would subsequently be required to pay premiums far in excess of originally scheduled premiums as originally contracted between the parties;"

3) "premiums on [the policy] were certain to increase or else the policy would lapse;"

4) "the initial interest rate applied to the cash value ... would not remain constant until the maturity date...."

5) "the interest is payable not on the full amount of monthly or annual premiums, but only a small percentage thereof remaining after deductions for costs of insurance, administrative costs and commissions."

(Compl. ¶ 97 (emphasis added); see id. ¶ 100, 110–111, 123 (similar)). These alleged acts of concealment, however, are premised upon the terms contained in the policy and the interpretation of those terms. Indeed, the second alleged act of concealment on its face is based upon

plaintiff's assertion of what he "originally contracted" to do, as emphasized above. (Compl. ¶ 97; see also DE 21 at 25 ("[I]t is the policies themselves that contain the fraudulent misrepresentations.")). Whether or not the policy permitted defendants to undertake the actions allegedly concealed is a matter of interpretation of the terms of the policy, which must be "relegat[ed] . . . to the arena of contract law." Broussard, 155 F.3d at 347. In this manner, all of plaintiff's tort claims are an attempt to refashion alleged breaches of the policy into torts. Where North Carolina does not permit plaintiff to do so, plaintiff's tort claims must be dismissed as a matter of law.

■■■ In addition, to the extent plaintiff asserts concealment or misrepresentation outside the policy, plaintiff has not pleaded with the requisite particularity the asserted acts of concealment or misrepresentation forming the basis for plaintiff's tort claims. For example, plaintiff asserts in the complaint that defendant Investors Life 1) "knowingly made false representations to potential purchasers of universal life insurance, touting that their premiums would never increase over the life of the policy;" 2) sold policies "with the guarantee that no further premium would ever be due;" and 3) used "typical, uniform and common sales techniques including representations that premiums would remain level, constant, fixed or vanish throughout the life of the policy." (Compl. ¶¶ 17, 20, 63).

These assertions, however, are not pleaded with the requisite specificity to satisfy the requirement that plaintiff allege sufficient factual matter, accepted as true, to "'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 663, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). They are much less sufficient to satisfy the requirement under Federal Rule of Civil Procedure 9(b) to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiff does not allege, for example, when such statements were made to him, where they were made, who made them to him, and how they were transmitted to him. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999). These pleading omissions are fatal to plaintiff's tort claims where they are all premised upon such generally asserted fraudulent concealment or misrepresentations, (see Compl. ¶ 97 (emphasis added); see id. ¶ 100, 110–111, 123 (similar)).[2]

Plaintiff suggests that defendants had a duty to disclose more clearly the risks inherent in the policy terms, and that such duty can give rise to a claim for fraudulent concealment. As discussed previously, however, the case cited for this proposition, Richardson, 182 N.C.App. at 558, 643 S.E.2d 410, is inapposite because it involved the sale of insurance products that undisputedly were illegal. Plaintiff also points to North Carolina insurance regulations which provide certain requirements for "non-level premiums." (DE 21 at 26 (citing 11 N.C. Admin. Code 12.0427(h))). Plaintiff has not, however, pleaded facts regarding any advertisements of defendants, supporting claims based upon viola-

---

**2.** Plaintiff suggests that his RICO claim premised upon "theft by deception" may be subject to different pleading rules than one premised upon fraud. (Compl. ¶¶ 124–125; DE 21 at 29). Plaintiff's "theft by deception" assertion is based upon conduct by defendant in obtaining money by "improperly assessing premi-

ums higher than owed by Plaintiff." (Compl. ¶ 125). As discussed in the text above, however, the policy allowed defendant to assess the premiums it is alleged to have assessed. Therefore, plaintiff's claim premised upon "theft by deception" fails as a matter of law.

tions of North Carolina insurance regulations.

In sum, plaintiff's tort claims fail as a matter of law and must be dismissed.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 17) is GRANTED. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). The clerk is DIRECTED to close this case.

SO ORDERED, this the 25th day of July, 2017.